# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

DARWIN ANTONIO AREVALO MILLAN, on his own and on behalf of others similarly situated,

            Petitioner-Plaintiff,

    v.

DONALD J. TRUMP, in his official capacity as President of the United States;
PAMELA BONDI, Attorney General of the United States, in her official capacity;
KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity;
U.S. DEPARTMENT OF HOMELAND SECURITY;
PETE HEGSETH, Secretary of the U.S. Department of Defense, in his official capacity;
U.S. DEPARTMENT OF DEFENSE;
MARCO RUBIO, Secretary of State, in his official capacity;
U.S. DEPARTMENT OF STATE;
TODD LYONS, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity;
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;
DAVID MARIN, in his official capacity as Director of the Los Angeles Field Office Director for U.S. Immigration and Customs Enforcement;

Case No. 5:25-cv-01207-JWH-PDx

**AMENDED ORDER REGARDING PETITIONER-PLAINTIFF'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER [ECF No. 2] AND MOTION FOR CLASS CERTIFICATION [ECF No. 3]**

FERETI SEMAIA, in his official
    capacity as Warden of the GEO
    Group Adelanto ICE Processing
    Center and Desert View Annex; and
DOES 1-10,

              Respondents-Defendants.

# I.  SUMMARY OF DECISION

Petitioner-Plaintiff Darwin Antonio Arevalo Millan ("Arevalo") is a Venezuelan citizen who is currently detained at the Desert View Annex or Desert View Modified Community Correctional Facility, which is associated with the Adelanto Immigration and Customs Enforcement ("ICE") Processing Center.[1]  Arevalo is potentially subject to a March 2025 executive order, Proclamation No. 10903 (the "Proclamation"), which is entitled "Protecting the American People Against Invasion."[2]  The Proclamation authorizes and directs the immediate removal of certain Venezuelan citizens.[3]  *See* 90 Fed. Reg. 13033.

Presently before the Court are two matters for decision:  (1) Arevalo's application for a preliminary injunction against Respondents-Defendants Donald J. Trump, Pamela Bondi, Kristi Noem, U.S. Department of Homeland Security, Pete Hegseth, U.S. Department of Defense, Marco Rubio, U.S. Department of State, Todd Lyons, U.S. Immigration and Customs Enforcement, David Marin, and Fereti Semaia (collectively, the "Government");[4] and (2) Arevalo's motion for class certification.[5]

After considering the papers filed in support and in opposition,[6] as well as the arguments of counsel at the hearing, the Court **GRANTS in part** Arevalo's Application and Motion.  The Government is hereby preliminarily **ENJOINED** and **RESTRAINED** from removing or transferring out of this district any member of the putative class pursuant to the Proclamation pending further Order of this Court regarding the amount of notice and process that is due prior to removal.

---

[1]    *See generally* Petition for Writ of Habeas Corpus and Class Action Compl. for Decl. and Inj. Relief (the "Petition") [ECF No. 1].

[2]    *See id.* at ¶ 1.

[3]    *See id.* at ¶ 163.

[4]    *See* Pet.-Pl.'s Emergency Appl. for a Temporary Restraining Order (the "Application") [ECF No. 2].

[5]    *See* Pet.-Pl.'s Mot. for Class Certification (the "Motion") [ECF No. 3].

[6]    The Court considered the documents of record in this action, including the following papers:  (1) Petition; (2) Application; (3) Motion; (4) Resps.-Defs.' Opp'n to the Motion (the "Motion Opposition") [ECF No. 11]; (5) Resps.-Defs.' Opp'n to the Application (the "Application Opposition") [ECF No. 12]; and (6) Pet-Pl.'s Reply in Supp. of the Application and Motion (the "Reply") [ECF No. 20].

## II.  BACKGROUND

### A.    The Proclamation

On March 14, 2025, President Trump issued an executive order, Proclamation
No. 10903, through which he invoked the Alien Enemies Act, 50 U.S.C. §§ 21 *et seq.* (the
"AEA"), to authorize and direct the immediate removal of certain Venezuelan nationals
presently in the United States.  *See* 90 Fed. Reg. 13033.  Specifically, President Trump
found and declared that Tren de Aragua, which is a "designated Foreign Terrorist
Organization with thousands of members," was "conducting irregular warfare and
undertaking hostile actions against the United States."  *Id.*  President Trump further
found that Tren de Aragua, in connection with Venezuelan authorities, was "perpetrating
an invasion of and predatory incursion into the United States" and that such an invasion
"poses a substantial danger to the United States."  *Id.*  Based upon those findings,
President Trump authorized and directed the immediate apprehension and removal of
"all Venezuelan citizens 14 years of age or older who are members of [Tren de Aragua],
are within the United States, and are not actually naturalized or lawful permanent
residents of the United States."  *Id.*

Shortly after the Proclamation became effective, five detainees and a nationwide
class sought to enjoin its enforcement.  *See Trump v. J.G.G.*, 145 S. Ct. 1003, 1005 (2025)
(*per curiam*).  On March 15, 2025, the U.S. District Court for the District of Columbia
issued two temporary restraining orders preventing the removal of the named plaintiffs
and preventing the removal under the AEA of any noncitizen in United States custody
who was subject to the Proclamation.  *See id.*  The Government appealed, and the
Supreme Court ultimately vacated those temporary orders based upon improper venue.
*See id.*  The Supreme Court also held, however, that "detainees subject to removal orders
under the AEA are entitled to notice and an opportunity to challenge their removal," so
long as those detainees pursue their challenges "in the district of confinement."  *Id.*

After the Supreme Court issued its *per curiam* opinion in *J.G.G.*, another class of
pretrial detainees applied for a temporary restraining order in the U.S. District Court for
the Northern District of Texas.  *See A.A.R.P. v. Trump*, 2025 WL 1417281, at *1 (S. Ct.
May 16, 2025) (*per curiam*).  The district court denied their application because the
Government confirmed that it had "no present plans to remove [the petitioners] until the
habeas petition [was] resolved" and that it would "notify the court if that change[d]."
*A.A.R.P. v. Trump*, 2025 WL 1148140, at *3 (N.D. Tex. Apr. 17, 2025).  The district court
also declined to certify the putative class.  *See id.* at *5.

Hours later, the Government caused some of those detainees to be served with
notices of AEA removal and informed them that they would be deported "tonight or
tomorrow."  *A.A.R.P.*, 2025 WL 1417281, at *3.  The detainees responded by moving for

an emergency temporary restraining order, and, when the district court did not
immediately issue it, they appealed to the Fifth Circuit and then the Supreme Court.  *See
id.*  The Fifth Circuit declined to issue an injunction, *see A.A.R.P. v. Trump*, 2025 WL
1148141, at *1 (5th Cir. Apr. 18, 2025), but the Supreme Court ordered the Government
"not to remove any member of the putative class of detainees" and held that the
Government must provide more than 24 hours' notice before removal.  *A.A.R.P.*, 2025
WL 1417281, at *2–*3.  The Supreme Court also vacated the district court's denial of
class certification and temporarily enjoined the Government "from removing putative
class members while the question of what notice is due is adjudicated."  *Id.* at *3.

## B.    The Facts as Alleged by Arevalo

Arevalo is a Venezuelan citizen and a vocal dissident of the Venezuelan
government.[7]  Arevalo applied for asylum in the United States, and he was granted a
permit authorizing him to work and reside in the United States pending the review of his
asylum application.[8]  During a scheduled ICE check-in, however, Arevalo was arrested
and placed in detention at the Desert View Annex or Desert View Modified Community
Correctional Facility, which is a part of, or an associate of, the Adelanto ICE Processing
Center.[9]  The Government did not provide Arevalo with prior notice of his arrest nor
serve him with a warrant or other documentation regarding the basis for his arrest.[10]  But
Arevalo was informed, presumably by someone associated with the Government, that his
arrest was premised upon his status as a Venezuelan with tattoos, which, although
allegedly basketball-related, could indicate that Arevalo is affiliated with Tren de
Aragua.[11]

Arevalo commenced this action by filing his Petition in this Court on Saturday,
May 17, 2025, on behalf of himself and a putative class of Venezuelan citizens subject to
the Proclamation.[12]  Through his Petition, Arevalo asserts 20 claims for relief under the
United States Constitution, the California Constitution, and various related statutes.[13]

---

[7]      Petition ¶ 2.

[8]      *Id.* at ¶ 3.

[9]      *Id.* at ¶ 5.

[10]     *Id.* at ¶ 6.

[11]     *Id.*

[12]     *See generally id.*

[13]     *See generally id.*

On the same day that Arevalo filed his Petition, he also filed the instant Application and Motion.[14]  Through his Application, Arevalo seeks the following elements of relief:

- to prevent the Government from removing Arevalo, or any member of the putative class, from the United States under the Proclamation;
- to prevent the Government from transferring Arevalo, or any member of the putative class, out of this judicial district;
- to require the Government to provide at least 30 days' notice prior to any removal or transfer out of this judicial district pursuant to the Proclamation;
- to provide Arevalo's counsel with notice of the transfer into this judicial district of any person designated as an Alien Enemy under the Proclamation; and
- to require the Government reasonably to preserve all property and evidence that it possesses regarding Arevalo and any other member of the putative class and to provide that evidence to Arevalo's counsel upon request.[15]

On Monday, May 19, 2025, the Court granted, on an emergency basis, part of Arevalo's requested relief.[16]  In that Order, the Court certified—for the purpose of immediate temporary injunctive relief—the following class:

> All noncitizens in custody in the Central District of California who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" and/or its implementation.[17]

The Court also (1) temporarily enjoined the Government from removing Arevalo, or any member of the putative class, under the AEA or the Proclamation pending further Order of this Court; (2) directed the Government to file responses to the Motion and Application no later than 12:00 noon on May 27, 2025; (3) set a hearing on the Motion and Application for Friday, May 30, 2025; and (4) provided that the Order would expire at the end of the hearing on the Motion and Application.[18]  During the hearing on Friday, May 30, 2025, the Court issued another Order extending the Temporary Restraining Order to Monday, June 2, 2025.[19]

---

[14]     *See* Application; Motion.

[15]     *See* Application.

[16]     Ord. re. the Applications (the "Temporary Restraining Order") [ECF No. 6].

[17]     *See id.*

[18]     *See id.*

[19]     *See* Order Extending Temporary Restraining Order [ECF No. 22].

### III.  LEGAL STANDARD

**A.    Rule 65—Preliminary Injunction**

A party seeking a TRO or a preliminary injunction must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir.), *as amended* (Mar. 11, 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  When the nonmoving party is a governmental entity, the last two *Winter* factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If a plaintiff seeking to enjoin an alleged constitutional injury "shows he is likely to prevail on the merits," then "that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). "Accordingly, when an alleged deprivation of a constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." *Id.* (quotation and brackets omitted).  Similarly, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor" because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (quotations omitted).  Thus, a plaintiff who has established that he is likely to succeed on the merits "ha[s] also established that both the public interest and the balance of the equities favor a preliminary injunction." *Id.*

In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

**B.    Rule 23—Class Certification**

The class action procedural vehicle is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotations omitted).  To certify a class, "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 [of the Federal Rules of Civil Procedure] are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (*en banc*).

Rule 23 governs class actions.  A party seeking class certification must establish all of the following:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4). After satisfying those four prerequisites—typically referred to as "numerosity," "commonality," "typicality," and "adequacy"—a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) that the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) that common questions of law or fact predominate over questions affecting individual members and a class action is a superior method for fairly and efficiently adjudicating the action. *See* Fed. R. Civ. P. 23(b)(1)-(3).

A district court has broad discretion to grant or deny a motion for class certification. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). However, "[a] party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 564 U.S. at 350. A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351.

Class certification "'is inherently tentative,'" so "the judge remains free to modify it in the light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978)). Additionally, the district court may, within its discretion, amend the class definition, even *sua sponte*. *See, e.g.*, *Davis v. Lab'y Corp. of Am. Holdings*, 604 F. Supp. 3d 913, 934 n.16 (C.D. Cal. 2022), *aff'd*, 2024 WL 489288 (9th Cir. Feb. 8, 2024) (certifying a class with a definition different than what was proposed in the motion), *cert. granted*, 145 S. Ct. 1133 (2025); *see also Davis*, 2024 WL 489288, at *1 (noting that, after awarding class certification, "the district court amended its class certification order to refine the class definitions"). "This flexibility enhances the usefulness of the class-action device." *Falcon*, 457 U.S. at 160.

## IV.  ANALYSIS

### A.    Article III Standing

As an initial matter, the Court must determine whether Arevalo has standing to bring this action.  A federal court may not exercise jurisdiction over a plaintiff's claim unless that plaintiff demonstrates that he or she has Article III standing.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To do so, a plaintiff must establish that he or she has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical."  *Id.* at 560 (internal citations and quotation marks omitted).  The burden to satisfy the injury-in-fact requirement is particularly demanding for a plaintiff who seeks injunctive relief—such a plaintiff "must demonstrate a 'real and immediate threat of repeated injury' in the future."  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011).  Additionally, the plaintiff must demonstrate that the injury is traceable to the defendant's conduct and that it is "likely" that "the injury can be redressed by a favorable decision."  *Id.*

The Government asserts that Arevalo lacks Article III standing because Arevalo is being detained pursuant to the Immigration and Nationality Act (the "<u>INA</u>"), not the AEA, and, thus, he does not face an imminent risk of deportation.  Specifically, the Government submitted a declaration from ICE Assistant Field Director Jackson Lara,[20] through which the Government contests some of the allegations in Arevalo's Petition.  According to Lara, (1) Arevalo "has not been designated as subject to removal" under the Proclamation;[21] (2) Arevalo failed to obtain prior approval before changing his address;[22] and (3) Arevalo has an individual removal hearing scheduled for June 9, 2025.[23]

To the extent that the Court can consider such arguments, *see Gonzalez v. U.S. Immigr. & Customs Enforcement*, 975 F.3d 788, 803 (9th Cir. 2020) (noting that a court must "assess [the plaintiff's] standing for prospective injunctive relief" by "relying on the allegations in the operative" complaint), the Supreme Court has already rejected them.  In *A.A.R.P.*, a district court in Texas denied preliminary injunctive relief to a petitioner and a putative class based upon a similar representation from the Government—that it did "not intend to remove [the petitioners] under the AEA while their habeas petitions [were] pending."  *A.A.R.P.*, 2025 WL 1148140, at *3.  After the district court denied injunctive relief, however, the Government notified members of the

---

[20]    *See* Decl. of Jackson Lara (the "<u>Lara Declaration</u>") [ECF No. 12-1].

[21]    *Id.* at ¶ 6.

[22]    *Id.* at ¶ 13.

[23]    *Id.* at ¶ 17.

putative class that it would remove them the following day. *See A.A.R.P.*, 2025 WL
1417281, at *2. On appeal, the Government once again committed to "forgo removing
the named petitioners pursuant to the AEA while their habeas proceedings [were]
pending"; nevertheless, the Supreme Court issued preliminary injunctive relief against
the Government. *Id.* at *4.

This Court is compelled to follow the precedent that the Supreme Court
established in *A.A.R.P.* Although the Government claims that Lara's testimony proves
that Arevalo is not at imminent risk of being deported pursuant to the Proclamation,
several key pieces of information are missing from the Lara Declaration. For example,
Lara states that Arevalo "has not been designated as subject to removal under the
AEA,"[24] but Lara leaves open the possibility that Arevalo's designation will change.
Similarly, Lara notes that the "failure to notify ICE of an address change can constitute
grounds for terminating a respondent" from an alternative-to-detention program and that
Arevalo failed to obtain prior approval before moving his residence.[25] But, notably, Lara
does not testify that Arevalo failed to provide ICE with advance notice of his address
change, nor that an asylum applicant's failure to obtain advance approval of an address
change constitutes a ground for detaining that applicant, nor that Arevalo was in fact
detained because he failed to provide advance notice or failed to obtain prior approval.[26]

While those omissions could have been inadvertent, the Government declined to
assure the Court that they were. Rather, when the Court pressed the Government on
those issues during the hearing, the Government conceded that it may designate Arevalo
for removal under the Proclamation at some point in the future and confirmed that ICE
may still conclude that Arevalo is subject to the Proclamation. The Government likewise
admitted that it was unsure whether Arevalo will be released from ICE custody if Arevalo
is granted asylum at his June 9, 2025, removal hearing—even though, if Arevalo were
detained pursuant to the INA, the Government would have no reason to continue such
detention after he receives asylum. In view of those representations (or in the absence of
appropriate assurances) and the Supreme Court's decision in *A.A.R.P.*, the Court
concludes that Arevalo faces an imminent threat of removal pursuant to the
Proclamation, and, accordingly, he has standing to pursue his claims.

---

[24]    *Id.* at ¶ 6.

[25]    *Id.* at ¶¶ 12 & 13.

[26]    *See generally id.*

B.      **Preliminary Injunction**

1.      **Likelihood of Success on the Merits**

Although Arevalo asserts many different claims for relief in his Petition, his core
allegations in support of his Motion and Application are that (1) the Proclamation is
unlawful because President Trump has not properly invoked the AEA; and (2) even if the
Proclamation is lawful, no person may be deported pursuant to the AEA until that person
has been afforded notice and the opportunity to challenge his designation as an alien
enemy.

a.      **Invocation of the AEA**

Before addressing Arevalo's challenges to President Trump's invocation of the
AEA, the Court must determine the extent to which the AEA is subject to judicial review.
For the reasons explained below, the Court concludes that, while the Court may interpret
the AEA, that interpretation is limited to deciding whether the President has found that
an invasion or predatory incursion has been perpetrated, attempted, or threatened. And,
because the President has made such a finding in this instance, the Court may not
entertain Arevalo's various challenges to the findings contained in the Proclamation or to
the President's exercise of his AEA authority.

Section 21 of the AEA provides as follows:

> Whenever there is a declared war between the United States and any foreign
> nation or government, or any invasion or predatory incursion is perpetrated,
> attempted, or threatened against the territory of the United States by any
> foreign nation or government, and the President makes public proclamation
> of the event, all natives, citizens, denizens, or subjects of the hostile nation or
> government, being of the age of fourteen years and upward, who shall be
> within the United States and not actually naturalized, shall be liable to be
> apprehended, restrained, secured, and removed as alien enemies. The
> President is authorized in any such event, by his proclamation thereof, or
> other public act, to direct the conduct to be observed on the part of the United
> States, toward the aliens who become so liable; the manner and degree of the
> restraint to which they shall be subject and in what cases, and upon what
> security their residence shall be permitted, and to provide for the removal of
> those who, not being permitted to reside within the United States, refuse or
> neglect to depart therefrom; and to establish any other regulations which are
> found necessary in the premises and for the public safety.

In March 2025, President Trump invoked Section 21 through the Proclamation, which
provides for the immediate apprehension, detention, and removal of "all Venezuelan

citizens 14 years of age or older who are members of [Tren de Aragua], are within the
United States, and are not actually naturalized or lawful permanent residents of the
United States." 90 Fed. Reg. 13033. President Trump's Proclamation marked the fourth
time in this Nation's history that the AEA had been invoked—and, as relevant here, the
first time that the AEA has been invoked in the face of an invasion or predatory incursion
rather than a declared war. *See J.O.P. v. U.S. Dept. of Homeland Sec.*, 2025 WL 1431263,
at *9 (4th Cir. May 19, 2025) (Gregory, J., concurring).

    Because the AEA has been invoked so rarely, there is limited binding authority
regarding the role that the judiciary plays once the President has issued a proclamation.
Nevertheless, in the few months since President Trump issued the Proclamation, several
other district and circuit courts have addressed challenges like those that Arevalo raises
here. First, in *J.G.G. v. Trump*, 2025 WL 890401 (D.D.C. Mar. 24, 2025), a District of
Columbia district court concluded that it is within the court's province to "construe the
terms 'nation,' 'government,' 'invasion,' and 'predatory incursion.'" *Id.* at *10. Two
D.C. Circuit judges agreed with the district court's analysis. In a concurrence to an order
affirming the district court's decision, Judge Henderson wrote that a court may not
evaluate questions for which there is "no answer in the plain text of the Act," such as
how long the President's authority under the AEA lasts, but a court may decide
"conditional questions," such as "the legal meaning of war, invasion and predatory
incursion." *J.G.G. v. Trump*, 2025 WL 914682, at *6 (D.C. Cir. Mar. 26, 2025)
(Henderson, J., concurring). In a separate concurrence, Judge Millett agreed that
defining "invasion" was a classic question of statutory interpretation that could—and
should—be resolved "with settled tools of statutory construction." *Id.* at *24 (Millett, J.,
concurring).

    A district court in the District of Colorado undertook a similar analysis. *See
D.B.U. v. Trump*, 2025 WL 1163530, at *7 (D. Colo. Apr. 22, 2025). Specifically, that
district court relied upon the Supreme Court's longstanding rule that "an individual
subject to detention and removal under [the AEA] is entitled to judicial review as to
questions of interpretation and constitutionality of the [AEA]," *J.G.G.*, 145 S. Ct. at
1006, and decided that, per that rule, a court must construe the terms "invasion" and
"predatory incursion," *D.B.U.*, 2025 WL 1163530, at *7 & *9. The Colorado district
court then concluded that the AEA uses those terms "to refer to military actions
indicative of an actual or impending war," as opposed to "mass illegal migration or
criminal activities." *Id.* at *9 (quotations omitted). From there, the Colorado district
court decided that the Proclamation "makes no finding that satisfies [those] definitional
demands," and, as such, it is unlawful. *Id.* at *10.

    A district court in the Southern District of Texas reached the same conclusion in
*J.A.V. v. Trump*, 2025 WL 1257450 (S.D. Tex. May 1, 2025). There, as in *D.B.U.*, the
Texas district court noted that the Supreme Court has "confirmed that 'questions of

interpretation' fall within the Judiciary's responsibility." *Id.* at *9. The Texas district
court further concluded that, although "matters intimately related to foreign policy and
national security are rarely proper subjects for judicial intervention," "[d]etermining
what conduct constitutes an 'invasion' or 'predatory incursion' for purposes of the AEA
is distinct from ascertaining whether such events have in fact occurred or are being
threatened." *Id.* at *10 (quotations omitted and alterations adopted). The Texas district
court therefore decided that the judiciary must "define[] the parameters of what conduct
constitutes an 'invasion' or 'predatory incursion'" but "leave[] to the Executive Branch
the determination of whether such conduct has been perpetrated, attempted, or
threatened." *Id.* And, because the Texas district court was not satisfied that "the factual
statements in the Proclamation . . . describe[d] an 'invasion' or 'predatory incursion'" —
as the Texas district court had defined those terms — it concluded that the Proclamation
"exceeds the scope of the [AEA] and, as a result, is unlawful." *Id.* at *18; *see also
Gutierrez-Contreras v. Warden*, 2025 WL 1400402, at *4 (C.D. Cal. May 14, 2025)
(agreeing with that analysis).

Next, in *G.F.F. v. Trump*, 2025 WL 1301052 (S.D.N.Y. May 6, 2025), a district
court in the Southern District of New York concluded that, "by their very nature,"
courts "interpret statutes" and that the AEA was another such statute to be interpreted.
*Id.* at *8. Then the New York district court determined that an "'invasion, as used in the
AEA, was understood as a 'hostile entrance upon the right or possessions of another' or a
'hostile encroachment,'" while an "'incursion' was understood to mean an 'attack' or
'invasion without conquest.'" *Id.* at *9-10 (alterations adopted). And, because "nothing
in the AEA" suggested that "refugees migrating from Venezuela, or [Tren de Aragua]
gangsters who infiltrate the migrants . . . seek to occupy territory, to oust American
jurisdiction from any territory, or to ravage territory," the New York district court
concluded that "the predicates for the Presidential Proclamation . . . do not exist" and
that the Proclamation "exceeds the scope of the AEA." *Id.*

Finally, in *A.S.R. v. Trump*, 2025 WL 1378784 (W.D. Pa. May 13, 2025), a district
court in the Western District of Pennsylvania took a slightly different approach. There,
the Pennsylvania district court defined "predatory incursion" to mean "a hostile entry
into the United States by a cohesive group of individuals . . . who are united by a common
goal of causing significant disruption to the public safety — whether that be the safety of
persons, proper[ty], or pecuniary interests — of those within the United States." *Id.* at
*17. And, unlike the other district courts that recently interpreted the AEA, the
Pennsylvania court determined that the Proclamation "complie[d] with the AEA"
because it included findings that satisfied the Pennsylvania district court's definition of
"predatory incursion." *Id.* at *17–*18.

The Government urges this Court to conclude that all of those decisions rest on
the faulty premise that the judiciary may conduct ***any*** review of the President's

Proclamation. According to the Government, "the President's authority under the AEA is not a proper subject for judicial scrutiny," [27] and "[w]hether the AEA's preconditions are satisfied is a political question committed to the President's discretion." [28] Thus, the Government asserts that, if this Court interprets the AEA in any way, that action will violate the political question doctrine and interfere with the separation of powers. [29]

The Court disagrees with the Government, but the Court also disagrees with the other district courts that have considered this question. In *Ludecke v. Watkins*, 335 U.S. 160 (1948), the Supreme Court addressed a claim that the President's authority under the AEA, if invoked during a time of war, "did not survive cessation of actual hostilities." *Id.* at 166. The Supreme Court held that "questions of interpretation and constitutionality" of the AEA were properly before it. *Id.* at 163. But despite being presented with those questions, the Supreme Court's review of the AEA extended only as far as was necessary to conclude that the President had "proclaimed that 'a state of war still exists.'" *Id.* at 170. The Supreme Court did not "question [the] belief by the President that enemy aliens who were justifiably deemed fit subjects for internment during active hostilities" retained "their potency for mischief" after active hostilities ended. *Id.* And, as relevant here, the Supreme Court declined plaintiff Ludecke's invitation to adopt a definition of "declared war" that would conflict with the President's decision that a state of war persisted. *See generally id.*

That analysis is consistent with the manner in which courts have, until President Trump's instant Proclamation, approached challenges to a President's authority under the AEA. In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), for example, the Supreme Court held that, while a court must "entertain [an alien's] plea for freedom from Executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to" the AEA, the President's "power over enemy aliens" must remain "undelayed and unhampered by litigation." *Id.* at 773–74. In *U.S.* ex rel. *Kessler v. Watkins*, 163 F.2d 140 (2d Cir. 1947), the Second Circuit interpreted the meaning of "invasion" and "predatory incursion," but only because doing so was necessary to reject the premise that the President's ability to "exercise" authority under the AEA was "limited to times of active hostilities." *Id.* at 142. And in *Citizens Protective League v. Clark*, 155 F.2d 290, 295 (D.C. Cir. 1946), the D.C. Circuit addressed a claim that alien enemies who were "merely potentially [hostile] because of their allegiance" to a foreign nation were not "dangerous." *Id.* at 294. Like the Supreme Court and the Second

---

[27]    Application Opposition 7:15–16.

[28]    *Id.* at 8:8–10.

[29]    *See id.* at 7:5–9:13.

Circuit, the D.C. Circuit construed the AEA only to the extent necessary to reject the
argument that the President had exceeded the scope of his authority under the AEA. *Id.*

The Court views its role in interpreting the AEA as constrained by those
precedents. Specifically, although Arevalo invites the Court to define the terms
"invasion" and "predatory incursion," that invitation is indistinguishable from
Ludecke's invitation in 1948 for the Supreme Court to define "war" as "active
hostilities." *See Ludecke*, 335 U.S. at 166. And like the Supreme Court, this Court does
not believe that the AEA permits it to accept such an invitation. Rather, the plain text of
the AEA makes clear that the President's authority to detain and remove noncitizens
hinges upon the President's "proclamation" that "any invasion or predatory incursion is
perpetrated, attempted, or threatened against the territory of the United States." *See* 50
U.S.C. § 21. By its nature, that congressional grant of authority leaves it to the President
to decide whether an "invasion" or "predatory incursion" has occurred. *See id.*; *see also
Ludecke*, 335 U.S. at 170 (holding that the AEA leaves the act of determining whether a
"war" is ongoing to "the usual political agencies of the Government"). And, because the
AEA permits the President to decide whether those events have occurred, the AEA
necessarily also grants to the President the discretion to decide what those terms mean.

That conclusion is reinforced by the approaches that several other courts have
taken with respect to President Trump's Proclamation. Although the other courts that
have addressed this issue have construed the terms contained in the AEA, many—if not
all—of those courts also acknowledged that they must accept the President's factual
findings and refrain from questioning "the propriety of the steps taken by the President as
to Venezuelan aliens and [Tren de Aragua] members." *J.A.V.*, 2025 WL 1257450, at *9.
That deference is unsurprising. The Supreme Court has long recognized that
"limitation[s] upon congressional delegations of power to the President over internal
affairs do[] not apply with respect to delegations of power in external affairs."
*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 n.2 (1952) (Jackson, J.,
concurring). And the AEA's delegation of power to the President is "as unlimited as the
legislature could make it." *Ludecke*, 335 U.S. at 164. Thus, when the President exercises
his authority under the AEA, he "acts pursuant to an express or implied authorization of
Congress," and the judiciary must defer to his judgment. *Youngstown*, 343 U.S. at 635.

Moreover, although some courts have attempted to construe the terms contained in
the AEA while purporting to defer to the President's judgment about the existence of
either an invasion or predatory incursion, the Court sees no way to strike such a balance.
Imagine that this Court concludes—as several other courts have—that an "invasion" or
"predatory incursion" requires "an organized, armed force entering the United States to
engage in conduct destructive of property and human life in a specific geographical area."
*J.A.V.*, 2025 WL 1257450, at *17. That definition necessarily reflects the Court's own
determinations about what circumstances can and cannot constitute an "invasion" or

"predatory incursion." *See, e.g.*, *id.* at 18 (concluding that "harm[ing] lives in the United Stats and enagag[ing] in crime" does not constitute a predatory incursion but that "attack[ing] a city, coastal town, or other defined geographic area, with the purpose of plundering or destroying property or lives" would); *see also A.S.R.*, 2025 WL 1378784, at *18 (concluding that Tren de Aragua's actions amount to a predatory incursion because Tren de Aragua resembles "military detachments or pirates around the time that Congress enacted the AEA"). But the AEA provides that the President—and not an Article III court—may proclaim whether an invasion or predatory incursion exists. Thus, construing those terms is inconsistent with the text of the AEA.

Similarly, to the extent that the Supreme Court has suggested that a court may inquire into whether a "declared war" exists, *see Johnson*, 339 U.S. at 775, that inquiry does not imply that a court may delve into whether an "invasion" or "predatory incursion" exists. Congress alone has the authority to declare war, so asking whether a war has been declared does not constrict the President's authority under the AEA. But a court cannot decide whether an invasion or a predatory incursion exists without supplanting, to some degree, the President's discretion. If the court defines "invasion" to require an "organized, armed group of individuals entering the United States . . . to conquer the country or assume control over a portion of the nation," *see, e.g, J.A.V.*, 2025 WL 1257450, at *18, that determination precludes the President from deciding that an "invasion" occurs if a foreign nation launches an unmanned drone or cyber-attack on the United States or if a foreign military aggressively enters the United States for some purpose other than assuming control over U.S. territory.[30] Nothing in the AEA suggests that the President's authority is limited in that way. *See Ludecke*, 355 U.S. at 170.

In short, the AEA's grant of authority to the President is close to "unlimited," *id.* at 164, and it includes the ability to decide whether an invasion or predatory incursion has occurred. As such, this Court cannot construe those terms without constraining the President's authority under the AEA. In view of Congress's decision to grant that authority to the President, that constraint is one that courts, which too "often suffer the infirmity of confusing the issue of a power's validity with the cause it is invoked to promote" and "of confounding the permanent executive office with its temporary occupant," must decline to impose. *See Youngstown*, 343 U.S. at 634. Accordingly, the Court concludes that Arevalo is unlikely to succeed on the merits of his claim that the Proclamation is unlawful.

---

[30]    The history of warfare is replete with instances of an aggressor's territorial invasion that is not conducted for the purpose of exercising sovereignty over the victim's land, including, for example, the 1870 Franco-Prussian War. *See, e.g.*, Geoffrey Wawro, *The Franco-Prussian War* (2003) (explaining, *inter alia*, that Bismarck's primary goal in provoking France was to unite Germany under Prussian leadership, not to expand its territory).

### b.    Due Process Clause

Although Arevalo is unlikely to succeed on the merits of his claim that the
Proclamation is unlawful, the Court concludes that Arevalo is likely to succeed on the
merits of his due process claims.  Indeed, the Government—which concedes that it must
provide detainees notice and process before removing them under the AEA—does not
appear to disagree that Arevalo will succeed on his due process claims.[31]  Instead, the
Government argues that (1) Arevalo has necessarily already received adequate notice and
process because he filed a habeas petition; and (2) the due process requirements are
satisfied because the Government agreed to provide notice to detainees before removing
them.

To the extent that those arguments relate to the merits of Arevalo's claims, they
are unavailing.  Because the Government insists that it has not provided Arevalo with
notice and urges the Court to dismiss Arevalo's habeas petition on that basis, the Court is
hard-pressed to conclude that the filing of the habeas petition somehow means that
Arevalo has already received adequate process and notice.  *See A.A.R.P.*, 2025 WL
1417281, at *4 ("[W]e are skeptical of the self-defeating notion that the right to the *notice*
necessary to 'actually seek habeas relief' . . . must *itself* be vindicated through individual
habeas petitions, somehow by plaintiffs who have not received notice."  (citation omitted)
(emphasis in original)).  Similarly, although the Government indicates that it will provide
detainees with more than 24 hours' notice of their removals, during the hearing the
Government refused to tell the Court how much notice it actually intends to provide.
Rather, the Government informed the Court that it is unsure whether it will provide even
14 days' notice to detainees before removing them—despite that another court in this
judicial district has already concluded that such notice is constitutionally required.  *See
Gutierrez-Contreras*, 2025 WL 1400402, at *6.

Accordingly, the Court concludes that Arevalo is likely to succeed on his claim that
AEA detainees are entitled to more notice and process than the Government has
promised to provide and that, as such, Arevalo is likely to succeed on the merits of his due
process claim.

### 2.    Irreparable Harm

Because the likelihood-of-success factor is "the most important factor" to be
considered when evaluating whether a plaintiff is entitled to a preliminary injunction, a
plaintiff who "shows he is likely to prevail on the merits" of a constitutional claim "will
almost always demonstrate he is suffering irreparable harm as well."  *Baird*, 81 F.4th at

---

[31]    *See generally* Application Opposition.

1042. Thus, "most courts hold that" when a plaintiff demonstrates that his or her
constitutional rights are at issue, "no further showing of irreparable injury is necessary."
*Id.*

Although the Ninth Circuit has recognized that the potential deprivation of a
constitutional right "unquestionably constitutes irreparable injury," *Planned Parenthood
of Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014), *abrogated on other grounds by
Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022), the Government nevertheless
argues that Arevalo will suffer no irreparable harm because (1) he is receiving the process
that he is due through removal proceedings pursuant to the INA; (2) the Government
provides adequate process under the AEA; and (3) Arevalo has not proven that he would
face persecution if he were removed from the United States.[32]  None of those arguments
is persuasive.

First, as the Government asserts, the INA and the AEA are independent statutes
with distinct requirements.  Thus, the fact that Arevalo will receive a hearing through his
INA proceeding has no bearing on his AEA-related claim.  Rather, as the Government
conceded at the hearing, the Government may choose to keep Arevalo in custody or
remove him from the United States even if Arevalo receives a favorable determination
through his INA proceeding.  *See, e.g., J.O.P.*, 2025 WL 1431263, at *1 (Benjamin, J.,
concurring) (discussing that an asylum applicant was removed pursuant to the
Proclamation despite a pending asylum decision that permitted the applicant to remain in
the United States).

Second, in view of the Government's refusal to outline the precise notice that it
will provide prior to removing a detainee pursuant to the Proclamation, the
Government's promise to provide *some* notice fails to mitigate the injury that Arevalo
may suffer in the absence of preliminary injunctive relief.  Assume, for example, that the
Government decides to provide a detainee with three days' notice that he will be removed
and that such notice allows insufficient time for the detainee to seek judicial review.  If the
detainee were not permitted to seek injunctive relief until after the Government provided
the three-day notice, then the detainee would be removed before he could seek any relief
at all.  *See A.A.R.P.*, 2025 WL 1417281, at *2.  But once a detainee is removed, he loses
the ability to pursue habeas relief, and, as such, he loses the ability to pursue any relief at
all.  *See Johnson*, 339 U.S. at 778 ("A basic consideration in habeas practice is that the
prisoner will be produced before the court.").  Thus, the only way to preserve the
detainee's ability to seek judicial review is to restrain the Government from removing
someone without providing notice that the Court has already deemed sufficient.

---

[32]     *Id.* at 23:19–24:12.

Finally, the possibility that Arevalo will be tortured or persecuted if he is removed from the United States is beside the point.  Through his due process claim, Arevalo seeks to avoid being deported as an alien enemy without being afforded the opportunity to challenge that designation—not to avoid deportation altogether.  Thus, the potential harm is that, in the absence of preliminary injunctive relief, the Government would deport Arevalo without allowing him to challenge his designation as an alien enemy.  Because—as the Supreme Court has noted—the Government has already attempted to take such steps in other cases, *see A.A.R.P.*, 2025 WL 1417281, at *1, this Court is reluctant to conclude that it would not do so here.

### 3.     Balance of the Equities and Public Interest

Just as a plaintiff who is likely to succeed on the merits of his constitutional claim "almost always" demonstrates that he is suffering an irreparable injury, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird*, 81 F.4th at 1042.  Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (*en banc*).  And the Government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).  Thus, "plaintiffs who are able to establish a likelihood that a policy violates the U.S. Constitution have also established that both the public interest and the balance of the equities favor a preliminary injunction." *Baird*, 81 F.4th at 1042 (quotation and alterations omitted).

Arevalo's likelihood of success on the merits "tips the merged third and fourth factors decisively" in his favor, *id.*, and the Government has not offered any persuasive reason for the Court to conclude otherwise.  At bottom, the Government argues that the public interest and equity factors favor the Government because the President must remain free to conduct foreign policy.[33]  But unless the Government intends to abandon its promise to provide detainees with reasonable opportunities to challenge their designations, it is unclear how preliminary injunctive relief would deter or prevent the Government from doing anything it would otherwise do.  Similarly, the Government may continue to develop and implement the notice and removal procedures that the Government finds appropriate, and, if the Court concludes that those procedures are in fact appropriate, the Government may undertake removals.  And, importantly, the Government may carry out lawful removal proceedings under other statutes or authorities, including the INA.

---

[33]     *Id.* at 24:13–25:23.

Accordingly, the Court concludes that Arevalo has satisfied all of the requirements for preliminary injunctive relief and **GRANTS** Arevalo's Application.

### 4.    Bond

When a district court grants a motion for a preliminary injunction, the plaintiff is required to post security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court has "wide discretion in determining the amount of bond." *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1071 (S.D. Cal. 2023). Indeed, a district court "has discretion to dispense with the security requirement" altogether if "requiring security would effectively deny access to judicial review," and courts "routinely impose either no bond or a minimal bond" in cases involving public interests. *City of South Pasadena v. Slater*, 56 F. Supp. 2d 1106, 1148 (C.D. Cal. 1999). That is particularly true when, as here, a plaintiff seeks to vindicate a constitutional right. *See Renna*, 667 F. Supp. 3d at 1071.

The Government has requested that, if the Court grants Arevalo preliminary injunctive relief, the Court also require Arevalo to post security for taxpayer funds if it is determined that the Government was wrongfully enjoined. The Government maintains, however, that Arevalo is being detained pursuant to the INA, not the AEA, and that it would provide Arevalo with all of the process that he is due whether or not the Court grants Arevalo preliminary injunctive relief. In view of those representations, the Government's compliance with the Court's Order will impose little, if any, additional cost to the Government or the taxpayers. Accordingly, the Court **ORDERS** Arevalo to provide nominal security of $1.[34]

## C.    Class Certification

Arevalo also seeks to certify the following class:

All noncitizens in custody in the Central District of California who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" and/or its implementation, with the exception of any noncitizen who filed an individual habeas petition prior to the commencement of this action.

---

[34]    *See* Pet.-Pl.'s Emergency Conference to Clarify/Modify Bond Request [ECF No. 24] (requesting a nominal bond of $1).

As an initial matter, the Government argues that class proceedings are unavailable in the habeas context.[35] There is significant support for the Government's position. *See, e.g.*, *A.A.R.P.*, 2025 WL 1417281, at \*9 (Alito, J., concurring) ("[I]t is doubtful that class relief may be obtained in a habeas proceeding."); *Betschart v. Oregon*, 103 F.4th 607, 635 (9th Cir. 2024) (Bumatay, J., dissenting) ("Whether habeas relief is available through class actions remains an open question at the Supreme Court."). But the Ninth Circuit has long held that habeas claims may be pursued on a class-wide basis, *see Mead v. Parker*, 464 F.2d 1108, 1113 (9th Cir. 1972), and it has affirmed those holdings as recently as May 2024, *see Betschart*, 103 F.4th at 615–16 (affirming that the Ninth Circuit's "binding precedent, which establishes that a class action can lie in habeas . . . remains valid").

Accordingly, the Court concludes that habeas petitioners are not barred from pursuing class-wide relief.

### 1.    Rule 23(a) Factors

#### a.    Numerosity

"A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable." *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 684 (C.D. Cal. 2020) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "To be impracticable, joinder must be difficult or inconvenient." *Id.* Generally, the numerosity requirement is satisfied when a proposed class includes 40 or more members. *See id.*

Although a plaintiff must provide more than "mere conclusory allegations as to the estimated class size," courts in the Ninth Circuit "relax[]" the numerosity requirement when a plaintiff seeks only injunctive or declaratory relief, which means that "even speculative or conclusory representations" can suffice. *Sueoka v. United States*, 101 F. App'x 649, 653 (9th Cir. 2004). Additionally, when the plaintiff has not had the benefit of discovery and the relevant evidence "is within the sole possession of the defendant," the plaintiff's burden is merely "to demonstrate that discovery measures are likely to produce persuasive information substantiating the class action allegations." *Doninger v. Pac. Northwest Bell, Inc.*, 564 F.2d 1304, 1313 (9th Cir. 1977).

Arevalo has not offered evidence regarding the actual size of the putative class, but he speculates that there are enough members to preclude individual joinder for several reasons. First, Arevalo alleges that "[h]undreds if not thousands of Venezuelans living in California and the greater Western U.S. region will potentially be subjected to summary

---

[35]    *See* Motion Opposition 5:22–6:22.

detention and removal."[36]  Next, Arevalo argues that the Government has already removed at least 137 Venezuelans, and it will likely detain and attempt to remove many more.[37]  According to Arevalo, those removals will necessarily include many people in this judicial district because "California contains one of the largest populations of Venezuelans in the United States."[38]  Finally, Arevalo speculates that the Government's practice of transferring groups of Venezuelan detainees to Texas facilities is "being held up by court orders currently being litigated," which may lead the Government to transfer those detainees to this judicial district instead.[39]

In view of the Ninth Circuit's flexible approach to the numerosity requirement in cases in which a plaintiff who has not yet been able to conduct discovery seeks only injunctive or declaratory relief, the Court concludes that Arevalo's speculative allegations regarding the potential class size satisfy the numerosity requirement.

### b.    Commonality

"[C]ommonality requires that the Class Members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.'"  *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Wal-Mart Stores*, 564 U.S. at 350).  To satisfy Rule 23(a)(2), common questions must be "'central to the validity' of the claims and capable of being resolved 'in one stroke.'"  *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024) (quoting *Wal-Mart Stores*, 564 U.S. at 350).  Not every question must be common to the class; "a single significant question of law or fact" satisfies the commonality requirement.  *Abdullah*, 731 F.3d at 957 (emphasis and quotation omitted).

The Government maintains that there is no question capable of resolution on a class-wide basis because each class member's habeas claim will require individual evidence and proof, such that "a common answer will not resolve this litigation."[40]  But commonality does not require the merits of every class member's claim to be identical nor for those claims be resolved with a single class-wide outcome.  *See id.*  Rather, commonality requires that the class members' claims rest upon "a common contention" for which a determination "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart Stores*, 564 U.S. at 350.  At a minimum, the

---

[36]    Petition ¶ 256.

[37]    *See id.*

[38]    *Id.*

[39]    *Id.*

[40]    Motion Opposition 7:22–23.

amount of notice that the Government must provide to a detainee prior to removal—which is an important issue on which the parties disagree and on which the answer will be the same for every class member—qualifies as such a question.

Accordingly, the Court concludes that the commonality requirement is satisfied.

### c.   Typicality

"To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(a)(3)). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other Class Members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). The Rule 23(a)(3) standard is "permissive," and it requires only that the representative's claims are "'reasonably co-extensive with those of absent Class Members.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citation omitted).

The Government contends that Arevalo cannot satisfy the typicality requirement because he has not sustained any injury and, unlike other members of the class, he has not been detained pursuant to the AEA.[41] Other courts have rejected similar arguments from the Government, *see, e.g.*, *D.B.U.*, 2025 WL 1163530, at *5, and the Court agrees with those courts on this issue. As explained above, although the Government asserts that Arevalo is being detained pursuant to the INA, the Government has also indicated that, if Arevalo receives a favorable outcome in his INA proceedings, the Government will not necessarily release Arevalo—which suggests that the INA may not be the sole reason for Arevalo's detention. Similarly, the Government has admitted that, even if it has not yet determined that Arevalo is subject to the Proclamation, the Government may make such a determination in the future. Thus, Arevalo's claim is "reasonably co-extensive with those of absent Class Members" in that Arevalo, like the other class members, is at risk of removal pursuant to the Proclamation without adequate notice and process. *Rodriguez*, 591 F.3d at 1124 (quotation omitted).

### d.   Adequacy

The Federal Rules require that the class representative "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Representation is "adequate" when (1) counsel for the class is qualified and competent; (2) the representatives' interests are not antagonistic to the interests of absent class members; and (3) it is unlikely that the action is collusive. *See O'Connor v. Boeing North American,*

---

[41]     *See id.* at 9:1–20.

*Inc.*, 184 F.R.D. 311, 335 (C.D. Cal. 1998) (citing *In re N. Dist. of California, Dalkon Shield
IUD Prod. Liab. Litig.*, 693 F.2d 847, 855 (9th Cir.), *as amended* (July 15, 1982)).

The Government argues that, because Arevalo is scheduled to appear at a removal
and asylum hearing before an immigration judge in a matter of days, he "may have no
incentive to prosecute the action vigorously on behalf of the class."[42]  The Court
disagrees.  The INA is a complex, technical set of statutes that contains many "opaque
and, at times, inflexible requirements."  *Xiao Lu Ma v. Sessions*, 907 F.3d 1191, 1199 (9th
Cir. 2018).  Meanwhile, the Government views the AEA, which largely "preclude[s]
judicial review," *Ludecke*, 335 U.S. at 164, as a far less complicated avenue by which the
Government can effectuate the removal of noncitizens.  The Government also appears to
view the AEA as a potential alternative to INA removal that the Government may use
when INA removal is unavailable.  *See, e.g.*, *J.O.P.*, 2025 WL 1431263, at *1 (Benjamin, J.,
concurring).  Thus, the Court sees no reason to doubt that Arevalo will vigorously litigate
the class claims regardless of his pending INA proceedings.

Accordingly, the Court concludes that Arevalo has satisfied the adequacy
prerequisite.

### 2.    Rule 23(b)(2)

In addition to the requirements of Rule 23(a), the proposed class "must satisfy at
least one of the three requirements listed in Rule 23(b)."  *Wal-Mart Stores*, 564 U.S. at
345.  When, as here, the class seeks injunctive relief, the only appropriate avenue for
certification lies in Rule 23(b)(2), which permits a court to certify a class only if the
defendant "has acted or refused to act on grounds that apply generally to the class, so that
final injunctive relief . . . is appropriate respecting the class as a whole."
Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(2) does not permit certification when a class asserts
"claims for *individualized* relief," such as claims for backpay, or "when each class
member would be entitled to an individualized award of monetary damages."  *Wal-Mart
Stores*, 564 U.S. at 360–61 (emphasis in original).  Rule 23(b)(2) also forbids the
certification of a class whose members "would be entitled to a *different* injunction or
declaratory judgment against the defendant."  *Id.* at 360 (emphasis in original).

The Government asserts that the Court cannot issue injunctive relief on a class-
wide basis because the only relief available to a habeas petitioner is an order of release.
The Court disagrees.  As the Government confirmed during the hearing, the Government
has not yet decided what notice it will provide to a detainee prior to removing that
detainee pursuant to the Proclamation.  The Government also has not decided what

---

[42]    *Id.* at 10:6–7 (quotation marks omitted).

process or procedures it will use to determine whether an individual is subject to removal under the Proclamation. Arevalo, meanwhile, seeks a judicial determination regarding the notice and process that the Government must provide to detainees prior to removal. Thus, a decision in Arevalo's favor would provide class-wide relief by enjoining the Government from removing class members without first providing notice that the Court deems adequate—even if the Court does not order the release of any class member.

Accordingly, the Court concludes that Arevalo has satisfied each of the Rule 23(2)(2) prerequisites and **GRANTS** Arevalo's Class Certification Motion.

## V. DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.    Arevalo's instant Motion and Application [ECF Nos. 2 & 3] are **GRANTED in part**.

2.    The following class is **CERTIFIED**, for the limited purpose of granting preliminary injunctive relief:

> All noncitizens in custody in the Central District of California who were, are, or will be subject to the March 2025 Presidential Proclamation entitled "Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua" and/or its implementation, with the exception of any noncitizen who filed an individual habeas petition prior to the commencement of this action.

3.    The Government is hereby preliminarily **ENJOINED** and **RESTRAINED** from removing Arevalo, or any member of the putative class, under the AEA or Proclamation No. 10903, pending further Order of this Court.

4.    The Government is further preliminarily **ENJOINED** and **RESTRAINED** from transferring Arevalo, or any member of the putative class, out of this judicial district for any purpose other than executing a removal order lawfully issued under the Immigration and Nationality Act.

5.    Arevalo is **DIRECTED** to post a bond in the nominal sum of $1 no later than June 16, 2025.

6.    This Order shall not prevent the Government from releasing from detention Arevalo or any class member. Similarly, this Order shall not prevent the

Government from removing Arevalo or any class member pursuant to a removal order
lawfully issued under the Immigration and Nationality Act.

**IT IS SO ORDERED.**

Dated:_____June 2, 2025_____

_____
John W. Holcomb
UNITED STATES DISTRICT JUDGE